# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TERRY W. COOK,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:12cv00029 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **CAROLYN W. COLVIN,**[1] | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Terry W. Cook, ("Cook"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Federal Rules of Civil Procedure Rule 25(d), Carolyn W. Colvin is substituted for Michael J. Astrue as the defendant in this suit.

reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Cook protectively filed his applications for SSI and DIB on November 26, 2007, alleging disability as of August 7, 2007, due to arthritis in the hands, knees and shoulders, herniated and degenerative discs in his back, residuals from a crushed right foot, anxiety and depression. (Record ("R."), at 155-61, 180, 183, 202, 234.) The claims were denied initially and upon reconsideration. (R. at 85-90, 93, 95-106.) Cook then requested a hearing before an administrative law judge, ("ALJ"), (R. at 107), which was held on September 3, 2010, at which Cook was represented by counsel. (R. at 35-54.)

By decision dated September 23, 2010, the ALJ denied Cook's claims. (R. at 19-30.) The ALJ found that Cook met the disability insured status requirements of the Act for DIB purposes through June 30, 2010.[2] (R. at 21.) The ALJ found that Cook had not engaged in substantial gainful activity since August 7, 2007. (R. at 21.) The ALJ found that the medical evidence established that Cook had severe impairments, namely degenerative disc disease and residuals of a crushed right

---

[2] Therefore, Cook must show that he became disabled between August 7, 2007, the alleged onset date, and June 30, 2010, the date last insured, in order to be entitled to DIB benefits.

foot, but the ALJ found that Cook did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21-23.) The ALJ found that Cook had the residual functional capacity to perform a limited range of sedentary work[3] that allowed him to stand for a minute or so in place up to three times in a two-hour period, that allowed a 15-minute break at two-hour intervals, that did not require him to crawl or climb ladders, ropes or scaffolds, that did not require him to work around heights or dangerous machinery or to operate automotive equipment and that did not require exposure to extreme cold. (R. at 23-34.) The ALJ also found that Cook would miss 10 to 12 days of work per year. (R. at 24.) The ALJ found that Cook was unable to perform his past relevant work. (R. at 29.) Based on Cook's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Cook could perform, including jobs as a telephone order clerk, a general production worker and an inspector or grader. (R. at 29-30.) Thus, the ALJ concluded that Cook was not under a disability, as defined by the Act, and was not eligible for DIB or SSI benefits. (R. at 30.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2013).

After the ALJ issued his decision, Cook pursued his administrative appeals, (R. at 14), but the Appeals Council denied his request for review. (R. at 1-5.) Cook then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481

---

[3] Sedentary work involves lifting up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2013).

(2013). This case is before this court on Cook's motion for summary judgment filed April 30, 2013, and the Commissioner's motion for summary judgment filed May 29, 2013.

## II. Facts

Cook was born in 1972, (R. at 155, 158, 180), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education and vocational training in auto mechanics. (R. at 207.) Cook has past work experience as a laborer and a truck driver. (R. at 193.) Cook testified at his hearing that he suffered from back and right foot pain, arthritis and depression. (R. at 44-45.) Cook stated that he could sit for up to 45 minutes without interruption, could stand for over an hour without interruption and could walk for up to 100 yards without interruption. (R. at 45-46.)

Robert Jackson, a vocational expert, was also present and testified at Cook's hearing. (R. at 49-54.) He classified Cook's past work as a truck driver as medium[4] and semi-skilled and his work as a heavy equipment operator and mechanic as heavy[5] and skilled. (R. at 50.) The ALJ asked Jackson to consider a hypothetical individual of Cook's age, education and work history, who was restricted to frequently lifting items weighing up to five pounds and occasionally lifting items weighing up to 10 pounds, who could stand for up to four hours in an

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2013).

[5] Heavy work is defined as work that involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If an individual can do heavy work, he also can do sedentary, light and medium work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2013).

eight-hour workday, but for up to one hour without interruption, sit up to six hours in an eight-hour workday, but up to two hours without interruption, who would need a 10- to 15-minute break at two-hour intervals, who should never climb ropes, scaffolds or ladders, who should not work at heights, who should not operate automotive equipment or work around hazards, dangerous machinery and exposure to extreme cold, who should not climb or crawl, who could occasionally bend, stoop and kneel, who could frequently reach and who would miss on average of 10 to 12 days of work a year. (R. at 51-52.) Jackson testified that a significant number of jobs existed that such an individual could perform, including jobs as a telephone order clerk, a general production worker and an inspector or grader. (R. at 52-53.) However, when asked if the same hypothetical individual would miss 13 to 18 days of work a year, Jackson testified that this limitation would eliminate all competitive employment. (R. at 53.) Jackson also testified that a hypothetical individual limited to simple, routine, repetitive tasks could still perform the jobs of a telephone order clerk, a general production worker and an inspector/grader. (R. at 53.) Jackson also stated that if the hypothetical individual was limited as indicated by Dr. Patrick A. Molony, M.D., there would be no jobs available that such an individual could perform. (R. at 54, 400-02.)

In rendering his decision, the ALJ reviewed records from East Tennessee Children's Hospital; Lee Regional Medical Center; Blue Ridge Neuroscience Center; Norton Community Hospital; University of Virginia Health Systems, ("UVA"); Dr. Patrick A. Molony, M.D.; Dr. Kevin Blackwell, D.O.; Dr. Ken W. Smith, M.D.; Dr. Robert McGuffin, M.D., a state agency physician; Dr. Richard M. Surrusco, M.D., a state agency physician; and Robert S. Spangler, Ed.D., a licensed psychologist. Cook's attorney submitted additional medical records from

Lee Regional Medical Center; Dr. Scott Litton, M.D.; Dr. Eric Parks, M.D.; and Dr. Molony to the Appeals Council for review.[6]

On August 17, 2006, Cook saw Dr. Patrick A. Molony, M.D., reporting that he was depressed and not sleeping well. (R. at 263.) Cook reported that he had broken up with his girlfriend. (R. at 263.) Dr. Molony diagnosed depression and anxiety. (R. at 263.) On January 23, 2007, Cook complained of hand and shoulder pain. (R. at 263.) He stated that Zoloft helped with his symptoms of depression, but that he could not afford to purchase the medication. (R. at 263.) Dr. Molony diagnosed depression, anxiety and arthritis. (R. at 263.) On October 18, 2007, Cook complained of severe back pain and radiculopathy down his right leg. (R. at 262.) Dr. Molony diagnosed back pain, a herniated disc, radiculopathy down the right leg and arthritis. (R. at 262.) On November 21, 2007, Cook again complained of back pain and radiculopathy down the right leg. (R. at 262.) On February 20, 2008, Cook complained of back pain. (R. at 260.) Dr. Molony noted that Cook's range of motion was reduced to 40 degrees forward flexion and 10 degrees extended. (R. at 260.) Dr. Molony diagnosed back pain, herniated disc at the L4-L5 level, radiculopathy to the right leg and arthritis. (R. at 260.) X-rays of Cook's lumbar spine performed on April 26, 2008, showed loss of the normal lordotic curvature with mild scoliosis. (R. at 266.) X-rays of Cook's right hand and left knee were normal. (R. at 267-68.) On May 19, 2008, Cook complained of back pain, radiculopathy down his leg and right hand pain. (R. at 260.) Dr. Molony noted that Cook's range of motion of his spine was significantly reduced. (R. at

---

[6] The Appeals Council found this medical evidence to be dated subsequent to the ALJ's September 23, 2010, decision, thus, finding that it was not relevant to the claims at issue. (R. at 2.)

260.)  Dr. Molony diagnosed back pain, herniated disc at the L4-L5 level, radiculopathy of the right leg, hypertension and arthritis.  (R. at 260.)

On February 12, 2009, Cook reported back pain with some numbness and pain in his right leg. (R. at 375.) Dr. Molony noted that Cook was using a walker. (R. at 375.) Dr. Molony reported that he received a call from UVA advising him that Cook had been prescribed a six-week supply of Percocet and that Dr. Molony should not prescribe Cook narcotics. (R. at 375.) It was reported that an ear, nose and throat doctor had examined Cook and noted that his septum had been destroyed as a result of snorting narcotics. (R. at 375.) On July 14, 2009, Cook reported numbness in both legs, but stated that his pain was gone. (R. at 388.) On October 13, 2009, Cook continued to report significant back pain. (R. at 395.) Dr. Molony noted that Cook's range of motion was reduced in his lumbar spine. (R. at 395.) Cook also reported that he experienced episodes where he became nervous, and Dr. Molony questioned whether these episodes could be panic attacks. (R. at 395.) On June 22, 2010, Cook complained of back pain and pain and soreness in both hands. (R. at 397-98.) Dr. Molony stated that, "I believe that this patient is not capable of performing his employment as a truck driver." (R. at 398.) On July 7, 2010, Cook complained of back pain, and he had reduced range of motion in the left shoulder. (R. at 405.)

On August 2, 2010, Dr. Molony completed an assessment indicating that Cook's ability to lift and carry items was affected by his impairment; however, he failed to provide any additional information as to what Cook's limitations would be. (R. at 400-02.) He indicated that Cook could stand and/or walk a total of two hours in an eight-hour workday and that he could do so for up to 30 minutes without interruption. (R. at 400.) Dr. Molony reported that Cook could sit for a

total of four hours in an eight-hour workday and that he could do so for up to one hour without interruption. (R. at 401.) He reported that Cook could occasionally climb, balance and crawl and never stoop, kneel or crouch. (R. at 401.) It was noted that Cook's abilities to handle and feel were affected by his impairment. (R. at 401.) Dr. Molony also noted that Cook should not work around moving machinery, humidity or vibration. (R. at 402.) On July 7, 2011, Cook complained of left shoulder pain, and it was noted that he had reduced range of motion. (R. at 404.) On October 11, 2011, Cook complained of left shoulder pain stating that he had seen an orthopedic doctor who had told him that he had rotator cuff syndrome.[7] (R. at 404.) He also reported that he was not sleeping well. (R. at 404.)

On September 27, 2006, Cook presented to the emergency room at Lee Regional Medical Center for complaints of low back pain which began after he lifted a piece of truck frame. (R. at 249-51.) X-rays of Cook's lumbar spine showed a pars interarticularis encroachment of the neural foramina at the L5-S1 level. (R. at 265.) An MRI of Cook's lumbar spine performed on October 25, 2006, showed a moderate-sized disc herniation at the L4-L5 level, a mild central disc herniation at the lumbosacral junction, associated degenerative changes and a significant disc space at the L4-L5 level. (R. at 264.)

On October 24, 2007, Dr. Ken W. Smith, M.D., a neurosurgeon, saw Cook for complaints of lower lumbar pain and right lower extremity numbness, pain and tingling. (R. at 253-56.) Examination revealed tenderness of the lumbar spine. (R. at 254.) Dr. Smith noted that Cook was oriented to person, place and time, and his mood and affect were appropriate. (R. at 255.) Dr. Smith diagnosed lumbar

---

[7] There is no evidence contained in the record that Cook was diagnosed or treated for rotator cuff syndrome.

herniated nucleus pulposus, ("HNP"), lumbar radiculopathy, lumbar degenerative disc disease and low back pain. (R. at 255.) Continued observation and conservative treatment was discussed in place of surgical intervention. (R. at 255.)

On May 6, 2008, Dr. Kevin Blackwell, D.O., examined Cook for complaints of a herniated disc, arthritis and shoulder pain. (R. at 270-73.) Dr. Blackwell noted that Cook did not appear to be in any acute distress and had good mental status. (R. at 271.) Dr. Blackwell's examination revealed that Cook's gait was symmetrical and balanced, even though Cook was tender throughout the lumbar musculature and tended to walk with a limp. (R. at 272.) Dr. Blackwell diagnosed chronic lower back pain and herniated disc, by history, right foot injury and poorly controlled blood pressure. (R. at 272.) Dr. Blackwell opined that Cook would be limited to no repetitive stair stepping, ladder climbing or work around unprotected heights. (R. at 272.) He found that Cook should avoid lifting items weighing more than 45 pounds, and frequently lift item weighing 15 pounds. (R. at 272.) Dr. Blackwell found that Cook could not squat, kneel, crawl or stoop and that he could bend for only one-third of the day. (R. at 272-73.) Dr. Blackwell placed no limitation on Cook's ability for hand usage, including fine motor movement. (R. at 272.)

On May 13, 2008, Dr. Richard Surrusco, M.D., a state agency physician, reported that Cook suffered from back disorders, disorders of muscle, ligament and fascia and essential hypertension. (R. at 55-64.) Dr. Surrusco reported that Cook could occasionally lift and carry items weighing up to 50 pounds and frequently lift and carry items weighing up to 25 pounds. (R. at 62-63.) He found that Cook could stand, walk and/or sit a total of six hours in an eight-hour workday and that his

ability to push and/or pull was limited in his lower extremities. (R. at 63.) No other limitations were noted. (R. at 63.)

On July 18, 2008, Cook was evaluated at UVA by Dr. Justin Smith, M.D., a neurosurgeon. (R. at 287-90, 315-17.) Dr. Smith reported that Cook was in no apparent distress and had full motor strength in all groups of bilateral extremities except for the right extensor hallucis longus, resulting from Cook's past injury to his right foot. (R. at 316.) An MRI of Cook's cervical spine showed mild reversal of the cervical lordosis, which could have been positional or secondary to muscle spasm and pain, a loss of signal from C2-C6 intervertebral discs compatible with disc desiccation, narrowing of the C5-C6 intervertebral disc space, mild narrowing of the left C5-C6 neural foramen and a disc protrusion at the T3-T4 level, extruding causing mild to moderate spinal canal stenosis. (R. at 287.) An MRI of Cook's lumbar spine revealed a large L5-S1 broad-based posterior disc protrusion, eccentric to Cook's right side, compressing the thecal sac, severely narrowing the right lateral recess and compressing the S1 nerve roots and a central and right paracentral L4-L5 tear and disc protrusion deforming the thecal sac. (R. at 289-90.) On July 25, 2008, Dr. Smith recommended selective nerve root injections. (R. at 282.) On August 4, 2008, Dr. Scott D. Chirichetti, D.O., evaluated Cook for a possible epidural steroid injection. (R. at 310-12.) Dr. Chirichetti diagnosed Cook with lumbar spondylosis and degenerative disc disease and gave Cook a prescription for Neurontin. (R. at 311.) On August 12, 2008, Dr. Chirichetti administered Cook's first epidural steroid injection, and Cook reported that his pain was beginning to decrease. (R. at 275-76.)

On November 24, 2008, Dr. Janet E. Lewis, M.D., a rheumatologist with UVA, examined Cook for rheumatoid arthritis. (R. at 303-05.) Upon examination,

Dr. Lewis found that Cook had a flexion deformity of the right thumb with the inability to fully extend at the right first metacarpophalangeal joint, ("MCP"), and the interphalangeal joint, ("IP"). (R. at 305.) However, Dr. Lewis also found that Cook did not have stigmata suggestive of rheumatoid arthritis and no evidence of active synovitis. (R. at 305.) She referred Cook to orthopedics for an evaluation of the flexion deformity with his right thumb. (R. at 305.)

On December 9, 2008, Dr. A. Bobby Chhabra, M.D., an orthopedic doctor at UVA, examined Cook for decreased motion in his right thumb and dorsal wrist pain. (R. at 300-02.) Cook had some palpable crepitus with passive extension and stiffness at the MCP joint with extension. (R. at 301.) Dr. Chhabra diagnosed Cook with right thumb metacarpal joint contracture and right wrist pain and ordered an MRI for further evaluation. (R. at 301.) An MRI of Cook's right wrist and hand showed a small slit-like tear in the central disc of the triangular fibrocartilage complex, ("TFC"), and a disruption of the volar radioulnar ligament; however, there was no evidence of osseous or tendon abnormality. (R. at 333-34.) An MRI of Cook's right thumb showed minimal flexor tenosynovitis distal to the MCP joint. (R. at 335.)

On January 28, 2009, Cook underwent a right L4-L5 and L5-S1 lumbar microdiskectomy. (R. at 326-27.) No complications were noted. (R. at 370.) On January 30, 2009, Cook's mother expressed concern about Cook's drug abuse. (R. at 374.) Cook admitted to snorting Lortab in the past. (R. at 374.) Examination revealed that Cook's nasal mucosa was pale, and he had a large systal defect. (R. at 374.) Cook stated that he had no plans to abuse his pain medication because it had been effective orally. (R. at 374.) A walker was provided for Cook upon discharge.

(R. at 374.) It was noted that Cook would benefit from follow-up physical therapy, but he declined it due to having no insurance. (R. at 374.)

On January 8, 2009, Dr. Robert McGuffin, M.D., a state agency physician, reported that Cook had the residual functional capacity to perform light work. (R. at 318-23.) He reported that Cook could occasionally climb, crouch and crawl and frequently balance, stoop and kneel. (R. at 320.) Dr. McGuffin reported that Cook should avoid moderate exposure to work hazards. (R. at 321.) No manipulative, visual or communicative limitations were noted. (R. at 320-21.)

On July 13, 2009, Robert S. Spangler, Ph.D., a licensed psychologist, evaluated Cook at the request of Cook's attorney. (R. at 382-86.) Cook was clean, neat and appropriately dressed. (R. at 382.) Cook's motor activity was tense. (R. at 384.) His mood was anxious and depressed. (R. at 384.) The Wechsler Adult Intelligence Scale - Fourth Edition, ("WAIS-IV"), was administered, and Cook obtained a full-scale IQ score of 86. (R. at 385-86.) Spangler diagnosed mild to moderate depressive disorder, not otherwise specified, mild anxiety disorder, not otherwise specified, cannabis use, in full remission, alcohol abuse, in full remission and nicotine dependence. (R. at 386.) Spangler assessed Cook's then-current Global Assessment of Functioning score, ("GAF"),[8] at 55 to 60.[9] (R. at 386.)

---

[8] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[9] A GAF score of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning...." DSM-IV at 32.

Spangler completed a mental assessment indicating that Cook had a limited, but satisfactory, ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to maintain attention/concentration, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 378-80.) He indicated that Cook had a seriously limited ability to deal with work stress, to understand, remember and carry out detailed job instructions and to demonstrate reliability. (R. at 378-79.) Spangler reported that Cook had a limited, but satisfactory, to a seriously limited ability to behave in an emotionally stable manner and to relate predictably in social situations. (R. at 378-79.) He also found that Cook had no useful ability to understand, remember and carry out complex job instructions. (R. at 379.) Spangler opined that Cook would miss about one workday a month due to his psychological impairments. (R. at 380.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2013).  *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§  404.1520(a), 416.920(a) (2013).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated September 23, 2010, the ALJ denied Cook's claims. (R. at 19-30.) The ALJ found that the medical evidence established that Cook had severe impairments, namely degenerative disc disease and residuals of a crushed right foot. (R. at 21.) The ALJ found that Cook had the residual functional capacity to perform a limited range of sedentary work that allowed him to stand for a minute or so in place up to three times in a two-hour period, that allowed a 15-minute break after two-hour intervals, that did not require him to crawl or climb ladders, ropes or scaffolds, that did not require him to work around heights or dangerous machinery or to operate automotive equipment and did not require exposure to extreme cold. (R. at 23-34.) The ALJ also found that Cook would miss on average 10 to 12 days of work per year. (R. at 24.)

In his brief, Cook argues that the ALJ's decision is not supported by substantial evidence of record. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 2.) In particular, Cook argues that the ALJ erred by failing to find that he suffered from a severe mental impairment.

(Plaintiff's Brief at 5-7.)  Cook also argues that the ALJ erred by failing to adhere to the treating physician rule and give controlling weight to the opinions of Dr. Molony.  (Plaintiff's Brief at 7-8.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975.)  Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Cook argues that the ALJ erred by failing to find that he had a severe mental impairment.  (Plaintiff's Brief at 5-7.)  Based on my review of the record, I do not find this argument persuasive. The Social Security regulations define a "nonsevere"

impairment as an impairment or combination of impairments that does not significantly limit a claimant's ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521(a), 416.921(a) (2013). Basic work activities include walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing, speaking, understanding, carrying out and remembering job instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations and dealing with changes in a routine work setting. *See* 20 C.F.R. §§ 404.1521(b), 416.921(b) (2013). The Fourth Circuit held in *Evans v. Heckler*, that ""[a]n impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience."" 734 F.2d 1012, 1014 (4th Cir. 1984) (quoting *Brady v. Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)) (citations omitted).

The ALJ found that Cook's allegations of mental impairment were not fully credible. (R. at 28.) The ALJ noted that Cook had not been referred for counseling. (R. at 28.) The ALJ also noted that Cook reported that he played video games, watched television, played cards, worked crossword puzzles and read the newspaper. (R. at 28, 185.) The ALJ also noted that Cook reported that he was able to handle finances and enjoyed going out to eat and watching movies with others. (R. at 24.) Cook reported that he had no difficulty getting along with others, dealing with changes or concentrating. (R. at 24, 190.) In addition, in December 2007, Cook reported that he could pay attention for as long as he needed, finish what he started and follow written instructions well. (R. at 190.) He reported that he had a fair ability to follow spoken instructions, to get along with authority figures, to handle stress and to handle changes in routine. (R. at 190-91.)

The record shows that Cook first complained of depression in August 2006. (R. at 263.) Dr. Molony prescribed Zoloft. (R. at 263.) In January 2007, Cook reported that Zoloft helped with his symptoms of depression. (R. at 263.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). Furthermore, in October 2007, Dr. Smith reported that Cook's mood and affect were appropriate despite complaints of pain. (R. at 255.) In October and November 2007, Cook shared no mental or emotional complaints with Dr. Molony, who made no mental diagnosis. (R. at 262.) There is no further mention of any mental complaint in Dr. Molony's notes until July 2009. (R. at 388.) In May 2008, Dr. Blackwell reported that Cook had "good mental status." (R. at 271.)

In July 2009, Spangler diagnosed mild to moderate depressive disorder and mild anxiety disorder. (R. at 386.) It is important to note that Spangler's opinions are based on the inaccurate information that Cook had been totally disabled since October 2006. (R. at 383.) Spangler found that Cook had a limited, but satisfactory, ability to follow work rules, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to function independently, to maintain attention/concentration, to understand, remember and carry out simple job instructions and to maintain personal appearance. (R. at 378-80.) While Spangler found that Cook had a seriously limited ability to deal with work stress, Cook reported that he had a fair ability to do so. (R. at 191, 378.) Spangler found that Cook had no useful ability to understand, remember and carry out complex job instructions. (R. at 379.) The ALJ asked the vocational expert whether the vocational base would be compromised if Cook was limited to simple, routine and repetitive tasks. (R. at 53.) The vocational expert confirmed that a limitation to simple, routine, repetitive tasks would not impact the jobs he identified. (R. at 53.)

While Spangler reported that Cook would miss one day of work per month, this opinion appears based more on Spangler's inaccurate understanding of Cook's medical condition. (R. at 386.) In fact, Spangler stated that Cook's prognosis was "fair in terms of depression and anxiety." (R. at 386.) Based on this, I find that substantial evidence supports the ALJ's finding that Cook did not suffer from a severe mental impairment.

Cook also argues that the ALJ erred by failing to adhere to the treating physician rule and give controlling weight to the opinions of Dr. Molony. (Plaintiff's Brief at 7-8.) Based on my review of the record, I find this argument unpersuasive. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2013). However, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by the clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Based on my review of the record, I find that substantial evidence exists to support the ALJ's decision to not give controlling weight to the opinions of Dr. Molony. The ALJ noted that Dr. Smith's notes, together with those of his other colleagues at UVA, failed to support Dr. Molony's assessment. (R. at 28.) The ALJ also noted that Dr. Molony's assessment was not supported by his own treatment notes. (R. at 28.) Dr. Molony opined that Cook was limited in handling and feeling, but he did not say to what degree or provide any supporting medical findings. (R.

at 401.) A few weeks prior to completing this assessment, Dr. Molony reported that Cook's grip strength was normal and equal. (R. at 398.) Dr. Molony opined that Cook would be limited to standing and/or walking up to two hours in an eight-hour workday, (R. at 400), but previously found that Cook's leg strength was equal and normal, with no sensory deficits and that Cook could walk on toes and heels and in tandem. (R. at 398.) The record shows that other than one finding associated with a prior foot trauma, Cook's motor strength remained full. (R. at 281.) He could ambulate at that time without any assistive devices despite an antalgic gait. (R. at 279.) Although he experienced difficulty with walking before he underwent the lumbar microdiskectomy, once he recovered from the surgery, Cook could "walk quite well." (R. at 397.) The record shows that post-operatively, Cook used exceptionally conservative measures to control any pain symptoms, including ibuprofen, ice and a muscle rub. (R. at 48.)

Dr. Molony opined that Cook would be limited to sitting for up to four hours total in an eight-hour workday and that he could do so for up to one hour without interruption. (R. at 401.) Dr. Molony failed to provide any supporting medical findings for this limitation. (R. at 401.) There is no evidence in the record that Cook was confined to bed or to his home, that he needed assistance caring for his daily needs or that he could not carry on a range of appropriate daily activities. (R. at 180-203, 220-27.) The ALJ did limit Cook to jobs in which sitting was limited to no more than two hours at any one time and that would allow him to stand for a minute or so in place three times in a two-hour period. (R. at 23.) The ALJ further limited jobs to those that would allow Cook to take a 10- to 15-minute break after two-hour intervals. (R. at 23.)

Based on this, I find that the ALJ properly weighed the medical evidence and that substantial evidence exists to support the ALJ's finding with regard to Cook's residual functional capacity. Therefore, I find that substantial evidence supports the ALJ's finding that Cook is not disabled and not entitled to DIB and SSI benefits.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's decision that Cook did not suffer from a severe mental impairment;

2.  Substantial evidence exists in the record to support the ALJ's weighing of the medical evidence;

3.  Substantial evidence exists in the record to support the ALJ's finding with regard to Cook's residual functional capacity; and

4,  Substantial evidence exists in the record to support the ALJ's finding that Cook was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Cook's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

**<u>Notice to Parties</u>**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2013):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     This 7th day of October 2013.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE